IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| ALLIED PROPERTY AND CASUALTY INSURANCE CO., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:18-cv-264 (AJT/IDD) |
| ZENITH AVIATION, INC., | ) ) | |
| Defendant. | ) ) | |

## **MEMORANDUM OPINION and ORDER**

In this insurance coverage dispute, the parties have filed cross-motions for summary judgment. [Doc. Nos. 20 and 30]. The dispositive issue is whether the "Pollution Exclusion" in the insurance policy Zenith purchased from Allied applies to preclude the coverage that would otherwise apply. For the reasons stated below, the Court concludes that the Pollution exclusion does not apply. Accordingly, Defendant Zenith Aviation, Inc. is entitled to summary judgment in its favor as to this coverage issue.[1]

### **I. BACKGROUND**

The following facts are undisputed unless otherwise noted.

Defendant Zenith Aviation, Inc. ("Zenith")[2] is an aircraft parts distributor. In spring 2017, Zenith hired Abby Construction Company to install an elevator at its warehouse located in Fredericksburg, Virginia. Abby "used jack hammers to cut the pit for the elevator but they later

---

[1] Both parties have filed requests for a declaratory judgment with respect to coverage: Allied, that it owes no duty to indemnify Zenith for amounts sought under the Policy in connection with Zenith's claimed loss; and Zenith, that Allied owes a duty to indemnify Zenith for amounts sought under the Policy. Zenith has also asserted in its counterclaim a claim for breach of contract and breach of the implied duty of good faith and fair dealing based on Allied's alleged failure to investigate adequately Zenith's claim, but has not moved for summary judgment on those claims.

[2] Zenith incorporated under the laws of Delaware with its principal place of business in Fredericksburg, Virginia, and is therefore a citizen of Virginia and Delaware.

1

found out that they were eight inches short." Zenith's Mem. in Supp. [Doc. No. 22] Statement of Undisputed Facts ("Zenith SOF") ¶ 2. Abby "then used a wet saw to cut away the additional eight inches of concrete, however they did not use any water with the wet saw." *Id.* ¶ 3. As a result, the saw generated a significant amount of concrete dust that billowed out of the warehouse prompting surrounding businesses to contact the fire department believing the dust to be smoke from a fire. *Id.* ¶ 4. The concrete dust particulate "settled on everything inside the building including inventory, shelves, walls and ceilings[]" and as a result, damaged Zenith's airplane parts inventory stored in the warehouse as well as its "automated electronic retrieval system." *Id.* at ¶¶ 5–6.

Plaintiff Allied Property and Casualty Company, Inc. ("Allied")[3] issued to Zenith a commercial insurance policy number ACP CPPP 7183988475 for the policy period July1, 2017 to July 1, 2018 (the "Policy"). *See* Compl. Ex. A. Zenith seeks coverage under the Policy for the losses caused by the concrete dust.[4]

The Policy provides, in pertinent part:

> **A. Coverage**
>
> We will pay for direct physical loss of or damage to covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss
>
> . . .
>
> **Covered Causes of Loss**
>
> . . . Covered Causes of Loss means direct physical loss unless the loss is excluded or omitted in this policy.

Zenith SOF ¶¶ 9, 10. The Policy also contains the following "Pollution Exclusion":

---

[3] Allied is a company incorporated under the laws of Iowa with its principal place of business in Iowa and is therefore a citizen of Iowa.
[4] In the Complaint, Allied alleges that Zenith has claimed losses in the amount of $3.2 million, including $1.1 million for property damage, $1.4 million in business interruption losses, and $650,000 in extra expense losses. Compl. ¶ 25.

> We will not pay for loss or damage caused by or resulting from any of the following: . . .
>
> discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss." But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss," we will pay for the loss or damage caused by that "specified cause of loss."
>
> This exclusion . . . does not apply to damage to glass caused by chemicals applied to the glass.

*Id.* at ¶ 13. The Policy defines "Pollutants" as follows:

> Any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

*Id.* at ¶ 15. The Policy defines "specified causes of loss" as

> fire; lightening; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism, leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage . . . .

*Id.* at ¶ 14. The Policy does not define any of the terms used to define either "pollutants" or "specified cause of loss," including "smoke," which appears in both.

## II. LEGAL STANDARD

In reviewing a motion for summary judgment, courts must view the facts in the light most favorable to the party opposing the motion. *Porter v. U.S. Alumoweld Co.,* 125 F.3d 243, 245 (4th Cir.1997). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A "genuine" dispute as to a material fact is present "if the evidence is such that a reasonable jury could ... return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). When a motion

3

for summary judgment is made and supported by affidavits, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). Unsubstantiated, conclusory claims without evidentiary support are insufficient to satisfy a non-moving party's burden on summary judgment. *Carter v. Ball,* 33 F.3d 450, 461–62 (4th Cir.1994); *Goldberg v. B. Green & Co.,* 836 F.2d 845, 848 (4th Cir.1988).

### III. ANALYSIS

Allied acknowledges that Zenith has suffered a "direct physical loss" that would be covered but for the application of the Pollution Exclusion. The central issue is therefore whether the Pollution Exclusion applies to preclude coverage.

The Policy was issued and delivered in Virginia, and therefore Virginia law applies. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941) (holding that federal courts sitting in diversity apply the choice of law rules of the state in which they sit); *Lackey v. Virginia Sur. Co.*, 167 S.E.2d 131, 133 (Va. 1969) (holding that the law of the place where an insurance contract is written and delivered applies). Because no Virginia court has definitively ruled on the scope and application of the Pollution Exclusion, or a close approximation, under facts comparable to those presented here, the Court must predict how the Supreme Court of Virginia would decide the issue, were presented to it. In making that determination, the Court must interpret and apply the language of the Policy according to settled principles of Virginia law regarding the interpretation of insurance policies. *See Seals v. Erie Ins. Exch*., 674 S.E.2d 860, 862 (Va. 2009*); Lower Chesapeake Assocs. v. Valley Forge Ins. Co*., 523 S.E.2d 325 (Va. 2000). Under those settled principles, the general rules that govern contract interpretation and construction apply, as supplemented by the principles of construction particular to insurance contracts.

"An insurance policy is a contract, and, as in the case of any other contract, the words used are given their ordinary and customary meaning when they are susceptible of such construction." *Hill v. State Farm Mut. Auto. Ins.*, 375, S.E.2d 727, 729 (Va. 1989). When interpreting an insurance policy, a court's ultimate purpose, as with contracts generally, is to give effect to the parties' mutual intent. *Seals,* 674 S.E.2d at 862. That intent is determined by reference to the parties' objective manifestations of that intent, as expressed in the language of the policy, *id* at 860, and the meaning of policy language is determined by considering the policy as a whole. *Id.* at 862. For that reason, the Court must not "examine certain specific words or provisions in a vacuum, apart from the policy as a whole. *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 636 (4th Cir. 2005) (applying Virginia law).

As with any contract, where the language of an insurance policy is unambiguous, courts have no discretion but to apply the terms as written. *See State Farm Fire and Cas. Co. v. Walton*, 423 S.E.2d 188, 191 (Va. 1992). However, where policy language is ambiguous, "[t]he courts . . . have been consistent in construing the language of such policies . . . in favor of that interpretation which grants coverage, rather than that which withholds it." *St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co.*, 316 S.E.2d 734, 736 (Va. 1984). In that connection, courts are to apply the rule of *contra proferentem*. Under that principle, "insurance policies are to be liberally construed in favor the assured and exceptions and exclusions are to be strictly construed against the insurer." *United Serv. Auto Ass'n v. Pinkard*, 356 F.2d 35, 37 (4th Cir.1966) (quoting *Ayres v. Harleysville Mut. Cas. Co.*, 2 S.E.2d 303, 305 (Va, 1939)); *see also Jefferson-Pilot Fire & Cas. Co. v. Boothe, Pritchard & Dudley,* 638 F.2d 670, 674 (4th Cir. 1980) ("[W]here two interpretations equally fair may be made, the one which permits a greater indemnity will prevail."). Based on that principle, policy language that purports to exclude a

specific event from coverage is "construed most strongly against insurer." *St. Paul Fire & Marine Co. v. S.L. Nusbaum & Co., Inc.,* 316 S.E.2d 734, 736 (Va. 1984); *see Virginia Farm Bureau Mut. Ins. Co. v. Williams,* 677 S.E.2d 299, 302 (Va. 2009) ("Because insurance policies usually are drafted by insurers, we construe ambiguous policy language purporting to exclude certain occurrences from coverage most strongly against insurer.").

Allied contends that the concrete dust released by the wet saw meets the definition of a "pollutant," viz., "any solid . . . or thermal irritant or contaminant," and that no exception to the Pollution Exclusion applies. Zenith disputes that the concrete dust constitutes a "pollutant," as defined in the Policy, but if it does, its loss was either caused by or resulted from "smoke," a "specified cause of loss" that removes its loss from the Pollution Exclusion.

The Policy defines "pollutant" as "any *solid*, liquid, gaseous or thermal *irritant or contaminant*, including *smoke*, vapor, soot, fumes, acids, alkalis, chemicals and waste." Zenith SOF ¶ 15 (emphasis added). Allied contends that the concrete dust meets the definition of a "pollutant" since it is "a solid …[or] gaseous… irritant or contaminant." *See* Allied Mem. in Supp. [Doc. No. 31] 11–12. Zenith contends conclusorily that "[c]ement is not a pollutant and in any event, Allied has offered nothing to support that it is." Zenith Resp. [Doc. No. 38] 9.

Given the Policy's definition of a "pollutant," concrete dust is clearly a pollutant since it can undoubtedly function as both an "irritant" and a "contaminant." *See Irritant*, Oxford English Dictionary (2d ed., 1989) (defining "irritant" in part as "in Path[ology] a poison, etc. which produces irritation; in Physiol[ogy] and in Biol[ogy] anything that stimulates an organ to its characteristic vital action."); *Contaminate*, Oxford English Dictionary (2d ed., 1989) (defining "contaminate" as "to render impure by contract or mixture; to corrupt, defile, pollute, sully, taint,

6

infect.").[5] There is no genuine issue of fact concerning whether the concrete dust "*contaminated*" Zenith's products and machinery. Zenith's alleged losses, by its own description, resulted from the concrete dust's deleterious effect on its inventory and machinery. For these reasons, the concrete dust meets the definition of a "pollutant" and therefore is within the operation of the Pollution Exclusion.

The Pollution Exclusion removes from coverage any "loss or damage caused by or resulting from [the] . . . dispersal . . . [or] migration . . . of 'pollutants'" unless (1) the dispersal or migration of a pollutant is itself *caused by* a "specified cause of loss" or (2) the dispersal or migration of a pollutant *results in* a "specified cause of loss" and the "specified cause of loss" causes the loss or damage. Here, the "pollutant" is the concrete dust. Zenith contends that the Pollution Exclusion does not apply because of the causative role played by "smoke," a "specified cause of loss." The issue then is whether (1) the dispersal or migration of the concrete dust was itself caused by "smoke;" or (2) whether the dispersal or migration of the concrete dust resulted in "smoke" and "smoke" caused Zenith's loss. Allied contends that under the undisputed facts, the concrete dust did not meet the definition of "smoke."

As mentioned above, the Policy does not expressly define "smoke," despite that term's appearance in both the definition of "pollutant" and "specified cause of loss." Zenith contends that the cloud of concrete dust released by the wet saw qualifies as "smoke," and therefore is a specified cause of loss. In support of this argument, Zenith relies heavily on *Andrew Robinson Int'l Inc. v. Hartford Fire Ins. Co.*, No. 030353, 2006 WL 1537382 (Mass. Super. Feb. 6, 2006),

---

[5] In its consolidated response to Allied's Motion and reply in support of its own Motion, Zenith argues for the first time that "[c]ement is not a pollutant and in any event, Allied has offered nothing to support that it is." Zenith Resp. 9. However, the plain language of the Policy defines "pollutant" as including "any solid . . . irritant or contaminant." The Policy does not limit or qualify the term "pollutant," and Virginia courts have declined to read limitations such as "environmental pollution," "industrial pollution," or "indoor pollution" into similar pollution exclusion clauses. *See, e.g.*, *PBM Nutritionals, LLC v. Lexington Ins. Co.*, 724, S.E.2d 707, 714 (Va. 2012).

7

in which a Massachusetts state court concluded, based on a similar pollution exclusion, that "smoke" could refer to "a cloud of fine particulate matter," in that case lead dust. Quoting *Andrew Robinson Int'l*, Zenith proposes that "'smoke' may mean '[a] cloud of fine particulate matter,' and 'dust' may mean '[f]ine, dry particles of matter' or '[a] cloud of dust.' Thus, under certain circumstances, dust and smoke are interchangeable." Zenith's Mem. in Supp. 11 (quoting *Andrew Robinson Int'l*, 2006 WL 1537382 at *9). In substance, Zenith contends that "smoke" includes any visible suspension of solid particles in a gaseous medium, whether they are the results of combustion or simply dust that has been agitated into the air. In advancing that position, it essentially contends that "smoke" is at least ambiguous as to the scope of its definition and under Virginia law that ambiguity must be resolved in favor of coverage.

Allied, on the other hand, contends that the word "smoke" is not ambiguous and necessarily means within the context of the Policy the "visible products of combustion," relying, *inter alia*, on *K & Lee Corp. v. Scottsdale Ins. Co.*, 769 F. Supp. 870 (E.D. Pa. 1991). The court in *K & Lee Corp* concluded that "smoke" commonly refers to the products of combustion, but more consistently refers to some *visible* phenomenon. *Id.* at 874 ("While smoke may result from some chemical reactions, the common usage of the term refers to the products of combustion and, more importantly, to matter that is visible."). Because the vapor at issue in that case was invisible, the *K & Lee* court did not have to consider, and did not conclude, that "smoke" referred only to the products of combustion.

In substance, dictionaries define "smoke" as the visible phenomenon of particulate suspended in a gas, typically, but not exclusively, as the products of combustion suspended in the hot gasses from a fire or other pyrolysis. In short, definitions of "smoke" include "the gaseous products of burning materials" and the more general "suspension of particles in a gas." *See e.g.*,

*Smoke Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/smoke (last visited August 27, 2018) (defining "smoke" as "the gaseous products of burning materials" or "a suspension of particles in a gas"). Allied points to the more limited definition; Zenith, the more general. The issue, then, is whether "smoke" as used in the Pollution Exclusion is limited to smoke caused by "the gaseous products of burning materials," or more generally to all visible "suspensions of particles in a gas." *Id.*

Allied argues that, while dictionaries are useful in interpreting contract language, "courts generally have recognized that it is inappropriate to interpret an insurance policy by inserting any conceivable dictionary definition of the term at issue." Allied's Mem. in Supp. 17 (citing *United States Fid. & Guaranty Co. v. First State Bank & Trust co.*, 125 F.3d 680 (8th Cir. 1997)). But Allied offers nothing from the context or structure of the Policy that counsels in favor of the more narrow definition of "smoke" it proposes, but simply relies on what it contends is its more common usage. *See* Allied's Mem. in Supp. 18–19 ("By contrast, the presence of dust in the air is not normally associated with combustion, and instead, can merely mimic smoke in appearance, . . . .").

The applicable definition of "smoke" as used in the Pollution Exclusion is unclear, with more than one reasonable definition. The text and structure of the Policy (including the other "specified causes of loss") are insufficient to conclude that the parties intended to adopt the more narrow definition of "smoke" for the purposes of the Pollution Exclusion. Well-settled principles of Virginia insurance law therefore require the Court to adopt the interpretation favoring coverage; "smoke" as used in the Policy refers to any visible suspension of particles in a gas, including the concrete dust suspended in ambient air in Zenith's warehouse.

Allied next contends that even if the concrete dust constitutes "smoke," it does not fall into either of the exceptions to the Pollution Exclusion. *See* Allied Mem. in Supp. 12–13 ("the 'discharge, dispersal, seepage, migration, release or escape' of the pollutant, regardless of whether the concrete dust is considered an 'irritant or contaminant' or 'smoke,' and the 'specified cause of loss' cannot be one and the same. Instead, the discharge . . . must 'result in' a specified cause of loss."). In short, Allied argues that the concrete dust in the air, even if it were considered "smoke," does not "cause" a loss when it merely settles on to sensitive airplane parts, contaminating them, because the concrete particulate in the air does not "result in" the dust on the inventory and machinery since it is the dust.

The exceptions to the Pollution Exclusion require, as Allied contends, a causal nexus between a specified cause of loss and the pollutant. As reflected in the stated facts, (1) Abby Construction used a wet saw without water to cut concrete; (2) that saw "released" or "dispersed" concrete particulate solids into the air; (3) that dust, rather than falling immediately to the ground, "billowed" into a cloud of particulate, resulting in "smoke"; and (4) the particulate from that cloud of smoke ultimately settled on Zenith's products and equipment, contaminating them and causing the loss.

Applying the plain text of the exceptions to the Pollution Exclusion, both exceptions apply. As required by the first exception, Zenith's loss resulted from the dispersal or migration of a pollutant (i.e., the concrete particulate) onto its inventory and machinery and that dispersal or migration was caused by a visible gaseous suspension of the concrete particulate in the air, i.e., smoke. The "dispersal" or "migration" of the concrete dust onto Zenith's products was therefore "itself caused by" the smoke from which it settled, and therefore the loss falls under the first exception to the pollution exclusion. As required by the second exception, the "discharge,

10

dispersal, seepage, migration, release or escape" of the concrete particulate dust from the wet saw "result[ed] in" smoke, a specified cause of loss, which then caused Zenith's loss.[6]

Allied's argument that "smoke" cannot simultaneously be both the "pollutant" and the "specified cause of loss" ("smoke cannot 'result in' smoke") mischaracterizes the required analysis. The pollutant is the concrete particulate; the specified cause of loss is the visible suspension of that particulate in a gas, i.e., smoke. Under the Pollution Exclusion, the "pollutant" and "the specified cause of loss" are distinct elements of a causal chain relative to the claimed loss. But given the Policy's definitions of each of those elements, the Pollution Exclusion does not preclude the concrete dust (the "pollutant") from being a constituent part of the smoke (the "specified cause of loss"). A "pollutant" is a substance that constitutes an "irritant or a contaminant." A "specified cause of loss" is an instrumentality of loss. The fact that the particles that contaminated Zenith's products and equipment were the same as the particles that were a constituent part of the "smoke" does not mean that there is no causal separation between the "pollutant" that was dispersed and the "specified cause of the loss" that dispersed it or resulted from it.

For the above reasons, the Court concludes that the Supreme Court of Virginia would conclude that the Pollution Exclusion does not apply and there is coverage under the Policy for Zenith's alleged losses. Zenith is therefore entitled to a declaration of coverage and summary judgment in its favor on as to the parties' respective requests for a declaratory judgment.

---

[6] "Falling objects" is also another "specified cause of loss." The concrete particulate in the dust cloud are "solid[s]." Because the loss was caused by the concrete particulate falling on to Zenith's inventory, an alternative analysis that arguably results in coverage is that the dispersal of the a " pollutant," i.e., the concrete particulate, resulted in a "specified cause of loss," i.e., "falling objects," and Zenith's loss is therefore within the second exception to the Pollution Exclusion.

11

## IV. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Defendant Zenith Aviation, Inc.'s Motion for Partial Summary Judgment [Doc. No. 20] be, and the same hereby is, GRANTED; and the Court concludes and declares that the Pollution Exclusion in the Policy does not apply to exclude coverage for Zenith's alleged losses caused by concrete dust; and it is further

ORDERED that Plaintiff Allied Property and Casualty Insurance Company's Motion for Summary Judgment [Doc. No. 30] be, and the same hereby is, DENIED.

The Clerk is directed to forward copies of this Order to all counsel of record.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
August 29, 2018